EXHIBIT 3

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4
                                    ORIGINAL
5

6      CIVIL ACTION NO.:   3:06CV599-CSC-E

7

8    AMBERLY JOHNSON,

9              Plaintiff(s),

10   vs.

11   WAFFLE HOUSE, INC.,

12             Defendant(s).

13

14

15

16                        DEPOSITION OF

17                     AMBERLY JOHNSON

18                          JOB NO. 1101-54967

19

20

21   BEFORE:    Victoria M. Castillo

22             Court Reporter and

23             Notary Public

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 2

1              In accordance with Rule 5(d) of

2    The Alabama Rules of Civil Procedure, as Amended,

3    effective May 15, 1988, I, Victoria M. Castillo, am

4    hereby delivering to ROBERT E. BATTLE, ESQ. the

5    original transcript of the oral testimony taken on

6    the 24th day of August, 2007, along with exhibits.

7              Please be advised that this is

8    the same and not retained by the Court Reporter,

9    nor filed with the Court.

10

11         S T I P U L A T I O N

12

13              IT IS STIPULATED AND AGREED, by

14    and between the parties through their respective

15    counsel, that the deposition of AMBERLY JOHNSON may

16    be taken before Victoria M. Castillo, Commissioner,

17    at INGRUM, RICE & PARR, 410 Second Avenue, Opelika,

18    Alabama 36801 on the 24th day of August, 2007.

19              IT IS FURTHER STIPULATED AND

20    AGREED that the signature to and the reading of the

21    deposition by the witness is waived, the deposition

22    is said to have the same force and effect as if

23    full compliance had been had with all laws and

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 3

1    rules of Court relating to the taking of

2    depositions.

3                    IT IS FURTHER STIPULATED AND

4    AGREED that it shall not be necessary for any

5    objections to be made by counsel to any questions,

6    except as to form or leading questions, and that

7    counsel for the parties may make objections and

8    assign grounds at the time of trial, or at the time

9    said deposition is offered in evidence, or prior

10   thereto.

11                   IT IS FURTHER STIPULATED AND

12   AGREED that notice of filing of the deposition by

13   the Commissioner is waived.

14

15

16

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 5

```
 1              A P P E A R A N C E S

 2    FOR THE PLAINTIFF(S):

 3         Benjamin H. Parr, Esq.

 4         Jarret Layson, Esq.

 5         INGRUM, RICE & PARR

 6         410 Second Avenue

 7         Opelika, Alabama 36801

 8

 9    FOR THE DEFENDANT(S):

10         Robert E. Battle, Esq.

11         BATTLE, FLEENOR, GREEN,

12             WINN & CLEMMER

13         The Financial Center

14         505 North 20th Street

15         Suite 1150

16         Birmingham, Alabama 35203

17

18              * * * * * * * * * * * * * * * * * * * *

19

20              I, Victoria M. Castillo, a Court

21    Reporter of Montgomery, Alabama, acting as

22    Commissioner, certify that on this date, as

23    provided by the Alabama Rules of Civil Procedure
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 6

1    and the foregoing stipulation of counsel, there

2    came before me at the law office of INGRUM, RICE &

3    PARR, 410 Second Avenue, Opelika, Alabama 36801,

4    commencing at 10:06 a.m., AMBERLY JOHNSON, in the

5    above cause, for oral examination, whereupon the

6    following proceedings were had:

7

8                    AMBERLY JOHNSON,

9        being first duly sworn, was examined and

10                  testified as follows:

11

12              COURT REPORTER:  Usual

13   stipulations?

14              MR. PARR:  That's fine.

15              MR. BATTLE:  Yes.

16

17   EXAMINATION BY MR. BATTLE:

18        Q.    Ms. Johnson, could you state your

19   full name for the record, please?

20        A.    Amberly Patrice Johnson.

21        Q.    What is your date of birth?

22        A.    July 1st, 1985.

23        Q.    And social security number?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 20

1        Q.      What was the name of the club?

2        A.      Club 808.

3        Q.      Other than being subpoenaed as a

4    witness in that case where you never got to

5    testify --

6        A.      They didn't need me.

7        Q.      Have you ever been asked to be a

8    witness for any other type of legal incident?

9        A.      No, sir.

10       Q.      Was that through the DA, I guess,

11   district attorney?

12       A.      Yes -- they had their own, yes, sir.

13       Q.      Have you ever been arrested?

14       A.      No, sir.

15       Q.      Let's talk a little bit about the

16   incident that we're here about today.

17       A.      Okay.

18       Q.      Tell me what date the incident

19   occurred.

20       A.      January 1st, 2006.

21       Q.      What time of day was it?

22       A.      I know it was before 12 -- I knew it

23   was before noon, probably like 11:30, or something

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 21

1    like that, but it was before twelve o'clock noon.

2        Q.    And I'm just going to go ahead and

3    ask you just to tell me what happened, and then I

4    may come back with some follow-up questions.

5        A.    See, in some kind of way we ended up

6    -- because we were just ordering food.  They wasn't

7    taking call-ins, so we went in and ordered, and we

8    was waiting, and the food was ready and everything,

9    and we were fixing to get ready to leave, and we

10   just heard a big, old crash.  It happened like ten

11   minutes.  It shocked everyone.

12       Q.    Were you there at the restaurant, a

13   sitting-down customer, or was this a to-go order?

14       A.    It was a to-go order, but I had to

15   sit in the restaurant to get it.  But, yes, I was

16   sitting there.

17       Q.    Do you remember what you ordered?

18       A.    Yes.

19       Q.    What was it?

20       A.    A double cheeseburger and double

21   hashbrowns, and my boyfriend had the same thing.

22              MR. BATTLE:  Off the record.

23                  10:42 a.m.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 22

1          (Short break.)

2              10:42 a.m.

3      Q.    (Mr. Battle)  Had you paid for the

4  food already?

5      A.    Yes -- see, that's when the accident

6  happened.  I had paid for it, and she was giving me

7  back my change, and that's when the man ran into

8  the store.  I didn't even get the change back or

9  the food.

10      Q.    Can you describe the person who you

11  were giving the money to?

12      A.    All I remember she was a lady.  I

13  don't really remember her face and what she looked

14  like, but I know she was a woman.

15      Q.    Had you ever been to this Waffle

16  House before?

17      A.    Uh-huh, plenty of times.

18      Q.    Would you say more than 20?

19      A.    No not more than 20 times, probably

20  about 15 times.

21      Q.    Have you ever been back?

22      A.    Once.

23      Q.    Have you been to other Waffle Houses?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 23

1          A.      Uh-huh.

2          Q.      How many times have you been to other

3    Waffle Houses since the accident?

4          A.      Probably no more than five times.

5          Q.      Was anybody there at the time of the

6    incident with you?

7          A.      Yes, my boyfriend, William.

8          Q.      I believe you said you heard a crash

9    and everyone was shocked, and that's sort of where

10   you left off.  What happened next?

11         A.      Oh, okay -- I heard the crash, and I

12   was turning around, and I seen like glass flying,

13   and I just turned around, and I just felt this big

14   pain that rushed through my leg, and all I know, I

15   seen a car and it was pushed all the way up to the

16   grill, and it happened to fast I can't really go

17   into detail, detail.  I was in shock because I

18   think I like blanked out, and then that's when I

19   realized I felt a pain from my leg.

20         Q.      You said the car pushed all the way

21   to the grill?

22         A.      Yes.  It was like knocked the cash

23   register -- from where I was sitting, the car came

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 26

1    was outside, and what stopped him from all the

2    stuff that was in the building.  Do you understand

3    what I'm saying?

4         Q.    I believe so.

5              MR. PARR:  Can we go off for just

6    a second?

7              MR. BATTLE:  Sure.

8              10:29 a.m.

9              (Short break.)

10             10:30 a.m.

11        Q.    (Mr. Battle)  Why don't you write

12   "parking lot" where the parking lot is.

13        A.    Okay -- there's parking lots -- well,

14   it's on this side, and it's all in the front.

15        Q.    So you were right here in front of

16   the register sitting in a chair?

17        A.    Yes -- like in a booth -- well, yes,

18   it's a chair, it's a chair.

19        Q.    Then the car comes in through that

20   outside wall, and you said it gets stopped by

21   another wall inside the restaurant?

22        A.    Like all the tables and stuff -- see,

23   I was sitting like at the little bar thing right in

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 27

1    front of the grill and right in front of the

2    register where everybody cook at, I was sitting

3    there, and that's where he drove into, that.

4        Q.      Was he driving pretty fast?

5        A.      I mean, I couldn't -- he came in

6    fast, but I really don't know.  But, see, because

7    how the parking lot is it's really hard for

8    somebody to run into there because it's a parking

9    lot, you know, you supposed to stop.  So I don't

10   know what was going on that made him mash the gas

11   to come in there.  I really I don't know.

12       Q.      Right -- and we can talk to --

13       A.      Excuse me -- but you have to mash

14   hard to come through a brick wall.  You have to

15   mash the gas hard to put up enough acceleration to

16   come through a brick wall.

17       Q.      Right -- can you describe the driver?

18       A.      He was an older man, and I know he

19   had a wife with him.  She wasn't quite as old as he

20   was, and he had -- if you have a wheelchair, you

21   have that little thing -- I don't know what it's

22   called -- handicap thing, and he had one of those

23   on the back of his car, as if he was trying to park

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 28

1    in the handicap part and something happened.

2         Q.    You said pain rushed through your

3    leg.  Did the car actually hit your leg?

4         A.    Yes -- it drug me because my pants

5    had glass, and it was ripped and everything from

6    the force.

7         Q.    Were you wearing long pants?

8         A.    Yes.

9         Q.    Were you wearing jeans, or what type

10   of pants?

11        A.    Jeans.

12        Q.    Did glass cut your leg?

13        A.    Yes -- I actually had a piece of

14   glass stuck in my leg.  Somebody had to pull it

15   out.

16        Q.    Who pulled it out?

17        A.    Some lady that worked at the Waffle

18   House.  I don't really remember the faces, but I

19   remember her because I felt the force coming out,

20   so -- and I seen -- I also seen that glass in my --

21        Q.    How big a piece of glass was it?

22        A.    It was a thick -- good, thick piece.

23        Q.    What dimensions would you say?  I

Page 29

1    know you are saying it was a thick piece of

2    glass --

3                      MR. PARR:  Object to the form.

4        Q.      (Mr. Battle)  Could you describe the

5    glass?

6        A.      It was like thick, you know, like you

7    had like a deck of cards, or something like that.

8    It was thick like that.  It wasn't like something

9    that would break from a window.  It was a window

10   glass, but it was thick.  I really can't explain

11   it, but it was big.

12       Q.      So you said someone at the Waffle

13   House pulled that out?

14       A.      Yes, as we were walking to the car.

15   Because the police came, and they were telling

16   everybody to leave because there was probably like

17   a gas leak, or something like that, so they said

18   everybody had to get out of the building.

19       Q.      Did you take any pictures of your

20   leg?

21       A.      Yes, I did.

22                      MR. BATTLE:  Can we go off the

23   record?

Page 30

1                          10:34 a.m.

2                       (Short break.)

3                          10:34 a.m.

4          Q.       (Mr. Battle)  So you said the car did

5      actually come into contact with your leg?

6          A.       Uh-huh.

7          Q.       How did you get out?

8          A.       My boyfriend and some black dude -- I

9      think he still work at the Waffle House, he's a

10     real, real big dude -- they helped me get out

11     because I wasn't able to walk.  They had to pick me

12     up and take me out of there.  My leg was swollen up

13     tremendously, very fast.  I wasn't able to walk out

14     of there.

15         Q.       Did they have to pull the car back to

16     get you out from in between the car and the cash

17     register?

18         A.       See, I wasn't like in between the

19     car.  It was when the car went in, you know how you

20     can brush up against something, that's what it did,

21     it brushed up against my leg.  I wasn't like

22     smushed in between the car, or nothing like that.

23     But as it brushed in, it went past my leg and tore

Page 31

1    my jeans, and all the glass -- that's how all the

2    stuff happened.

3        Q.      Was it your left leg?

4        A.      Yes, my left leg.

5        Q.      So was your back to the car when it

6    came in?

7        A.      Yes -- everybody's was.  It was like

8    the back -- and like we sitting here and the car

9    drive in.  It was like that.  It was unexpected.

10   Couldn't nobody say run and jump or look out, or

11   nothing like that.  It was so fast, nobody couldn't

12   say nothing.

13       Q.      Did the car brush your leg below your

14   know knee or above your knee or right about at your

15   knee, or where on your leg?

16       A.      Like my knees were bruised -- and I

17   still have problems out of that -- and my calf,

18   right on the side.  That's where all the damage was

19   done.

20               MR. BATTLE:  Can we go off the

21   record for just a second?

22               10:37 a.m.

23               (Short break.)

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 32

```
 1                      10:39 a.m.

 2                  MR. BATTLE:  Let me show you what

 3    I've marked as Defendant's Exhibit 1-A through

 4    Defendant's Exhibit 1-I.

 5                      (WHEREUPON, photographs were

 6                      marked as Defendant's Exhibit 1-A

 7                      through Defendant's Exhibit 1-I

 8                      and are attached to the original

 9                      transcript.)

10        Q.      (Mr. Battle)  If you can just go

11    through each one of those and identify what's in

12    those pictures.

13        A.      This is the pictures of the accident,

14    and all of these bruises, that's where it hit me

15    at.

16        Q.      Which one are you pointing to?  Are

17    these pictures of your leg that was injured in

18    the --

19        A.    , Yes, in the accident.

20        Q.      Incident that we're talking about

21    today?

22        A.      Uh-huh -- and then those are bruises

23    that's bruised.
```

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 47

1        Q.      Then they got you outside the store;

2    is that right?

3        A.      Yes, sir.

4        Q.      Where did you go?

5        A.      I was sitting in my car because the

6    ambulance, nobody wasn't there yet.  Only the

7    police were there.  I don't know how they got there

8    so fast, but they was the only ones there.  But my

9    boyfriend just drove me to the hospital.

10        Q.      Had the police arrived before you got

11    outside the restaurant or after?

12        A.      I think it was like while I was going

13    out there.  We was all like meeting up at the same

14    time because they wasn't already there when I got

15    there.  It was like I seen -- when I was going out,

16    they was like trying to come in to see was there

17    anybody injured, and all that type of stuff.

18        Q.      Was anybody else injured to your

19    recollection?

20        A.      No, sir, I was the only one.

21        Q.      Did you talk to the driver of the

22    car?

23        A.      No, sir, I haven't talked to him.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 48

1    Well, yes, I talked to him like, probably like last

2    year at the beginning -- I mean, at the end, and

3    that was only because I seen him at Wal-Mart, but

4    it wasn't like no ugly talking, or stuff like that.

5    They actually apologized to me for what had

6    happened, and they asked me was I all right, and

7    stuff like that.

8         Q.     Was that both the driver and his

9    wife?

10        A.     Yes, sir.

11        Q.     When they put you in the car outside

12   the restaurant after the accident, were you in the

13   driver side or the passenger side?

14        A.     Passenger -- I was the passenger.

15        Q.     Were you there when the ambulance

16   arrived?

17        A.     Yes, I was.

18        Q.     Did they offer to take you in the

19   ambulance to the hospital?

20        A.     They offered, but, you know, I was

21   conscious and talking, and they asked me was I --

22   could I ride, and told them that, no, I would let

23   my boyfriend take me to the hospital.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 52

1          A.       To the -- no, sir.

2          Q.       Other than that time going in that

3     Waffle House, have you been back to that Waffle

4     House since the accident?

5          A.       No, sir.

6          Q.       So you said your boyfriend drove you

7     out to the hospital, right?

8          A.       Yes, sir.

9          Q.       What happened when you got to the

10    hospital?

11         A.       I was in a lot of pain, and I felt my

12    leg swelling because my pants, all of a sudden,

13    they had got real tight around my leg, and I

14    couldn't feel nothing.  It was numb from my knee

15    down.  It was just excruciating pain, and I was

16    sitting in the waiting room.  I couldn't walk.

17    They had to bring the wheelchair out to the car to

18    get me.  I had X-rays done, but they never -- it

19    wasn't like any broken bones.  It was just bruised

20    pretty bad.

21         Q.       Did the hospital then release you?

22         A.       Yes.  They did X-rays, they gave me

23    some pain pills, and, yes, they released me.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 53

1          Q.       How many hours were you at the

2     hospital?

3          A.       Probably about two hours.

4          Q.       Did they tell you you should come

5     back for a follow-up visit?

6          A.       No -- but my family doctor -- because

7     my leg wouldn't, it wouldn't go down, it stayed

8     swollen like for so long, and we thought it was

9     like blood clots, and so I went to a family doctor.

10          Q.       I may go and point to a couple of

11     medical records here in a minute just to get the

12     chronology down of the visits that you had.

13          A.       Yes, sir.

14          Q.       What did you do when they discharged

15     you from the hospital?

16          A.       I went home, I went to sleep, because

17     I was -- because, you know, they gave me some pain

18     medicine when I was at the hospital, and that like

19     put me to sleep. So I went home, and I got some

20     rest. And I was on bedrest for a while because

21     they didn't know why my leg was swelling. They

22     thought I had blood clots in my leg, so I had to be

23     on bedrest for a little while, probably like a

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 54

1    couple of days, and then I had went -- well, no, I

2    didn't go to the doctor, I was just on bedrest for

3    a while.  And eventually, I had got worried because

4    my leg wouldn't like go down, so I went to the

5    family doctor.

6         Q.    So you basically just stayed at home

7    for the next few days?

8         A.    Yes, sir.

9         Q.    Until you went back to the doctor

10   because it didn't feel like it was getting better?

11        A.    Yes, sir.

12        Q.    Do you remember going to another

13   Waffle House later that day?

14        A.    Yes, I went to the other one just to

15   get my food, but I didn't go in.  My boyfriend went

16   in.  I just reordered my food all over.  It was the

17   one down there in front of the mall.  I don't know

18   what the name of the street is, but I didn't go

19   into that one.  He went in for me.

20        Q.    In front of which mall?

21        A.    The Village Mall in Opelika.  It's

22   the Colonial Mall now, it's not the Village Mall.

23        Q.    How long after you got out of the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 55

1    hospital did you go back to get that meal?

2         A.      No, it was -- it was like while we

3    were leaving the hospital because he drove me home,

4    and then we just went and got some food.  So I

5    didn't go home.  I just went to the Waffle House,

6    then I ate, then I went home, and I was on

7    bedrest.

8         Q.      So you went to the Waffle House on

9    the way home from the hospital?

10        A.      Yes, sir.

11        Q.      Did you pay for that meal?

12        A.      He did -- well, no, you know

13   something, we did not pay for it because we called

14   the people, and they called the other ones at the

15   Waffle House, and they gave us our meal, since we

16   had ordered it and they didn't give us our change

17   and stuff like that, they had give us that meal for

18   free.

19        Q.      Was it same order, the double

20   cheeseburger and the hashbrowns?

21        A.      Yes, sir.

22        Q.      Were you pretty hungry by then?

23        A.      Yes -- hungry and sore and sleepy.

2100 3rd Avenue North, Suite 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 56

1      Q.      So did you eat that meal in the car?

2      A.      At home, we took it home with us.

3      Q.      Did you ask for it to be free?

4      A.      No -- we just thought maybe since,

5      you know, all that stuff had happened, the least

6      they could do was give it to us for free.

7      Q.      They did give it to you for free?

8      A.      Yes, sir.

9      Q.      Did you call ahead?

10     A.      Yes, he did -- yes, sir, my boyfriend

11     did.

12     Q.      Was anybody else at the hospital with

13     you other than Mr. Dowdell?

14     A.      My family members -- my mother and my

15     brother, and their spouses, came down there after

16     it happened.

17     Q.      Those are the ones that you gave me

18     the names of earlier?

19     A.      Yes, sir.

20     Q.      Was anybody else living at home with

21     you at this time other than you and your parents,

22     and I believe didn't you say you had one other

23     brother or sister?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 80

1    here.

2         Q.      And tax returns, and things like

3    that?

4         A.      Yes, sir.

5         Q.      Did they give you any other

6    documentation that showed how much you worked each

7    week?  Did you have like pay stubs every two weeks,

8    check stubs?

9         A.      Yes, sir.

10        Q.      Do you still maintain any of those

11   check stubs?

12        A.      I don't know since I don't work there

13   no more.  I probably have a couple that I can

14   probably find.

15                MR. BATTLE:  Let me show you what

16   I've marked as Defendant's Exhibit F, which is a

17   document entitled "Release".

18                        (WHEREUPON, a document was marked

19                        as Defendant's Exhibit F and is

20                        attached to the original

21                        transcript.)

22        Q.      (Mr. Battle)  Do you remember signing

23   this document?

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 81

1          A.      Yes, sir.

2          Q.      Is that your signature there at the

3   bottom?

4          A.      Yes, sir.

5          Q.      Do you remember about the date that

6   you signed that?

7          A.      The date in June -- yes, sir.

8          Q.      So it was in June of 2006?

9          A.      Yes, sir.

10         Q.      Did you receive a settlement from the

11  insurance company for the driver?

12         A.      Yes, sir, I did.

13         Q.      That relates to the accident that

14  we're talking about here today that happened at the

15  Waffle House, right?

16         A.      Yes, sir.

17         Q.      You got a settlement of $12,500; is

18  that right?

19         A.      Yes, sir.

20         Q.      I believe you said earlier that your

21  medical expenses were about $1,250, and your lost

22  wages were about $2,500, so that's about four times

23  that amount; is that correct?