AST-27
REV. 1/91

PRIVATE PROPERTY
**ALABAMA UNIFORM TRAFFIC ACCIDENT REPORT**

OPS Accident No.

Shaded Areas To Be Used By Data Processing Only    Sheet 1 of 1 Sheet(s)    Miscellim No.    Local Case No. 05-000008

**LOCATION AND TIME**

Date 01 01 2006   Time 1126 AM   Day of Week M T W TH (S)   County 43 OPELIKA   Rural / Municipal (Private Prop.) 03   Local Zone

On Street, Road or Highway: 967 FOXRUN PARKWAY
At Intersection With or (Node 1): THE WAFFLE HOUSE   And (Node 2): NA

9999   Street or Road Code Ø   Node Code Ø   Feet/Miles From / To   Node 2 (Circle One) 98

Intersection Related: 1-Node 1  2-Node 2  (N)-Not Rel. Related
First Harmful Event 71   Event Location 5   Distance to Fixed Object NA FT.

**UNIT NO 1**

Driver Full Name: JAMES ALEXANDER GRESHAM   Street Address: 112 MARTIN AV   City and State: OPELIKA, AL   ZIP 36804   Telephone No. (834) 749-0416
Date 02 06 1925   Race W M   Sex M   DL State AL   Driver License No. 2017027   DL Class DM   COL Status C   Yes 25 Miles (Yes)
Place of Employment: UNEMPLOYED   Liability Insurance Co. STATE FARM   Social Security No.
Driver Condition: 1-No Defect   Officer's Opinion: (3) Yes NO Unk   Alcohol Drugs: Yes (NO) Unk   Type Test 1-Blood Test  2-Urine Test   Test Results NA
Vehicle: 1992 LINC   Model TC 4D   V.I.N. ILNLM81WXNY608373   License Tag Number HOK37   State AL   Year 06
Owner's Name: SAME

**UNIT NO 1 VEHICLE**

Speed Limit 99 MPH   Est Speed NA   Citation Offense Charged NONE   Damage Severity 2   Vehicle Towed Away? NA   Occupants in Unit 2

**UNIT NO 2 / PEDESTRIAN**

Driver: AMBERLY PATRICE JOHNSON   Street Address: 1809 S. LONG ST., OPELIKA, AL   ZIP 36801   Telephone No. 749-9182
Date 07 01 1985   Race B   Sex F   DL State NA   Driver License No. NA
Place of Employment: UNEMPLOYED   Liability Insurance Co. NA

Pedestrian   Travel Road Name: PARKING LOT OF WAFFLE HOUSE   Road 9999   94   5

**CODES** (legend at bottom)

Plaintiff's Exhibit A

**CODES**

**SEATING**

| | | | |
|1|42|24|10|
Unit 1

Other Involved Unit
(Circle One)
12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstance/
Codes Not Applicable
Other Involved
Safety Equipment

| | | | |
|2| | | |
Unit 2

Other Involved Unit
(Circle One)
12 - Pedestrian
13 - Rider of Domestic Animal
14 - Occ. of Non-Motorized Vehicle
15 - Victim of Other Circumstance/
Codes Not Applicable
Other Involved
Safety Equipment  91

SAFETY EQUIPMENT
01 - None Installed
05 - Not Applicable
09 - Unknown (Any Type)
Lap Belt Only
11 - Fastened
12 - Not Fastened
Lap/Shoulder Harness
21 - Lap Only Used
22 - Neither Used
23 - Shoulder Only Used
24 - Both Used
Motorcycle Helmet
31 - None Used
32 - Used
Air Bags
41 - Deployed, Belts Used
42 - Not Deployed, Belts Used
43 - Deployed, Belts Not Used
44 - Not Deployed, Belts Not Used
Child Restraints
81 - Child Restraint Used
82 - Child Restraint Not Used
83 - None Used
Pedal Cycle/Pedestrian
91 - Contrasting Clothing
92 - Non-contrasting Clothing

**VICTIMS**

| Name | Taken To | | Unit No | Seat Pos | Injury Type | Age | Sex | Ejec- tion | First Aid By |
|---|---|---|---|---|---|---|---|---|---|
| AMBERLY PATRICE JOHNSON | 1809 S. LONG ST. OPELIKA 36801 | | 2 | 12 | C | 20 | F | A | N |
| EAST ALABAMA MEDICAL CENTER | Address  PERSONAL VEHICLE | Taken By | | | | | | | |
| NA | Taken To | Taken By | | | | | | | |

**CODES**

Injury Types
K - Killed
B - Bruises/Abrasion/Swelling
A - Visible or Carried from Scene
C - Not Visible—Not Pain/Faint

Ejected
N - Not Ejected
P - Partially
T - Trapped
U - Unknown
X - Not Applicable

First Aid By
A - Ambulance Attended
D - Doctor
M - Paramedic
O - Other
P - Police
U - Unknown
N - None

**NARRATIVE AND DIAGRAM**

- NA

Officer's Opinion of What Happened: MV1 WAS PARKING FACING NORTH IN THE PARKING LOT OF WAFFLE HOUSE. DRIVER OF MV1 HIT THE GAS INSTEAD OF THE BRAKE, JUMPED THE CURB AND CRASHED INTO THE BUILDING AND STRUCK A CUSTOMER. DRIVER OF MV1 STATED BELIEVES HE HIT THE GAS INSTEAD OF THE BRAKE AND DROVE INTO THE WAFFLE HOUSE. WITNESS KIRK STATED HE SAW MV1 PARKING, THEN JUMP INTO THE AIR CRASHING INTO THE BUILDING.

**ROADWAY ENVIRONMENT**

For Each Roadway Environment Field, Circle One Entry for Each Involved Unit

Unit 1

Contributing Road Defects
4 - None
1 - Shoulders Low
2 - Shoulders High
3 - Holes, Bumps, Etc
8 - Other

Surface Construction
1 - Asphalt
2 - Concrete
3 - Brick
4 - Unpaved
8 - Other

Condition
1 - Dry
2 - Wet
3 - Icy
4 - Snow/Slushy
5 - Muddy
8 - Other

Accident is Or Related To Road Construction Zone?
Yes   No

Material in Roadway (Contributing)
1 - None
2 - Rocks
3 - Trees/Limbs
4 - Dirt
5 - Gravel
6 - Oil/Petrol.
8 - Other

Material Source
1 - Not Applicable
2 - Natural Environment
3 - Dropped From Vehicle
4 - Already in Road, But Fell From Vehicle
8 - Other
9 - Unknown

Character
1 - Straight—Level
2 - Straight—Down Grade
3 - Straight—Up Grade
4 - Straight—Hillcrest
5 - Curve—Level
6 - Curve—Down Grade
7 - Curve—Up Grade
8 - Curve—Hillcrest

Vision Obscured By:
'07 '07 - Not Obscured
1 - Buildings
2 - Signboard
3 - Trees, Crops, Bushes
4 - Blowing Snow/Sand
5 - Hillcrest
6 - Curve in Road
7 - Fog
8 - Parked Vehicle
9 - Moving Vehicle(s)
10 - Blinded by Sunlight
11 - Fire/Smoke
12 - Dust
13 - Blinded by Headlights
14 - Embankment
15 - Rain on Windshield
16 - Snow on Windshield
88 - Other
99 - Unknown

Traffic Control
1 - Police Officer
2 - R.R. Crossing Bars
3 - R.R. Flashing Lights
4 - R.R. Cross Bucks/Pave Mark
5 - Pedestrian Control
6 - Traffic Signal
7 - Flashing Beacon
8 - Stop Sign
9 - Yield Sign
10 - Lane Control Device
11 - Flagger
12 - No Passing Zone
87 - None
98 - Other

Traffic Control Functioning
Yes   Yes
No    No
N/A   N/A

DOT Railroad Crossing No.

Opposing Lanes Separated By:
87 - None
1 - Paved Surface
2 - Unpaved Surface
3 - Broken Painted Line
4 - Solid Painted Line
5 - Concrete Barrier
6 - Metal Guard Rail
7 - Fence
98 - Other Barrier

Trafficway Lanes
1 - One Lane
2 - Two Lanes
3 - Three Lanes
4 - Four Lanes
5 - Five Lanes
6 - Six Lanes or More

One-Way Street
Yes   Yes
No    No

**INVESTIGATION**

Light
1 - Daylight
2 - Dawn
3 - Dusk
4 - Darkness—Road Not Lit
5 - Darkness—Road Lit

Weather
1 - Clear
2 - Cloudy
3 - Rain
4 - Snow
5 - Sleet/Hail
6 - Crosswind
7 - Fog
8 - Other

Locale
1 - Open Country
2 - Residential
3 - Shop's or Business
4 - Mfg. or Industrial
5 - School
6 - Playground
8 - Other

Non-Vehicular Property Damage
1 - None Visible   3 - Moderate
2 - Light          4 - Severe

Property Damage Description
Description: EXTERIOR AND INTERIOR DAMAGE TO BUILDING
Owner:
Address: 907 FOXRUN PW., OPELIKA, AL 36801

| Time Police Notified | Time Police Arrived | Time EMS Arrived | Name of Photographer |
|---|---|---|---|
| 1130 AM/PM | 1132 AM/PM | 1133 AM/PM | SGT. TOMPKINS |

| Witness Full Name | Address | Telephone |
|---|---|---|
| JAMES GROVER KIRK | 3300 HWY 431 N. OPELIKA, AL 36801 | (334) 705-8757 |
| NA | | |

| Name of Investigating Officer(s) at Scene | Officer ID | Agency ORI | Supervisor Reviewed |
|---|---|---|---|
| M. PAULSON | 0004 | 0430200 | |
| G. JERNIGAN | 0101 | 0430200 | MP |
| C. HARDMAN | 0313 | 0430200 | |

The data in this report reflects my best knowledge, opinion and belief concerning this accident, but no warrant is made as to the factual accuracy thereof.

Signature of Investigating Officer                    Date 1/1/2006

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 31

1    my jeans, and all the glass -- that's how all the

2    stuff happened.

3         Q.     Was it your left leg?

4         A.     Yes, my left leg.

5         Q.     So was your back to the car when it

6    came in?

7         A.     Yes -- everybody's was.  It was like

8    the back -- and like we sitting here and the car

9    drive in.  It was like that.  It was unexpected.

10   Couldn't nobody say run and jump or look out, or

11   nothing like that.  It was so fast, nobody couldn't

12   say nothing.

13        Q.     Did the car brush your leg below your

14   know knee or above your knee or right about at your

15   knee, or where on your leg?

16        A.     Like my knees were bruised -- and I

17   still have problems out of that -- and my calf,

18   right on the side.  That's where all the damage was

19   done.

20               MR. BATTLE:  Can we go off the

21   record for just a second?

22                    10:37 a.m.

23                    (Short break.)

Plaintiff's Exhibit B          60*Birmingham, AL 35203*www.merrillcorp.com
                               1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 32

1                    10:39 a.m.

2                    MR. BATTLE:   Let me show you what

3    I've marked as Defendant's Exhibit 1-A through

4    Defendant's Exhibit 1-I.

5                         (WHEREUPON, photographs were

6                         marked as Defendant's Exhibit 1-A

7                         through Defendant's Exhibit 1-I

8                         and are attached to the original

9                         transcript.)

10        Q.     (Mr. Battle)  If you can just go

11   through each one of those and identify what's in

12   those pictures.

13        A.     This is the pictures of the accident,

14   and all of these bruises, that's where it hit me

15   at.

16        Q.     Which one are you pointing to?  Are

17   these pictures of your leg that was injured in

18   the --

19        A.     Yes, in the accident.

20        Q.     Incident that we're talking about

21   today?

22        A.     Uh-huh -- and then those are bruises

23   that's bruised.

Plaintiff's Exhibit B

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 33

1    Q.    You are pointing to Defendant's

2    Exhibit Defendant's Exhibit 1-C.  Those bruises,

3    are those on the outside of your leg, or the inside

4    of your leg?

5    A.    Well, this -- let me see -- this is

6    the outside of my leg because that that's where it

7    hit me at.  See, the bruises around my knee, it was

8    swollen, and then these are bruises.  And this one

9    right here, right there is --

10    Q.    Let's identify that one for the

11    record, Defendant's Exhibit 1-C.

12    A.    Right here where the glass stuck me

13    in my leg at, and they had to pull it out --

14    Q.    And that's the scrape that's right

15    below where your knee is on the back of your leg?

16    A.    Uh-huh.

17    Q.    And that's the piece of glass we

18    talked about earlier that the Waffle House employee

19    took out you said?

20    A.    Uh-huh.  See, this is the scratch.  I

21    don't really know where it come from, but right

22    here is where all the damage was done.  My leg was

23    dent in.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 34

1    Q.    You are talking about halfway down

2  from your knee to bottom of the picture?

3    A.    It's like that's the damage was

4  done. It's not above my knee, it's like from my

5  knee down.

6    Q.    Is there any damage that was done

7  below the tattoo on your leg right here?

8    A.    Just, you see those bruises right

9  there, that's about it.

10    Q.    Are the bruises that are on your

11  other leg, are those the result of the accident?

12    A.    Huh-uh, those aren't bruises. See,

13  over here it was bruised really bad on the back.

14  It's kind of red.

15    Q.    We are looking now at Defendant's

16  Exhibit 1-E.

17    A.    This one is -- see, you can see the

18  cut better that was in my leg.

19    Q.    Defendant's Exhibit 1-F -- and when

20  were these pictures taken? Were they all taken at

21  the same time?

22    A.    Yes -- the pictures, yes.

23    Q.    Were they taken about the time of

**Plaintiff's Exhibit B**

Page 35

1    right after the accident?

2         A.       Uh-huh.

3         Q.       Do you know what date they were

4    taken?  I see the day -- I assume this is the day

5    they were developed -- which was January 21st?

6         A.       Yes, I developed them then.  But I

7    took them like right after the accident happened.

8    Right here my leg was swollen -- you can tell it's

9    a little bigger than this side, and it was swollen

10   for like months at a time.

11        Q.       Who took these pictures?

12        A.       My parents -- my mother took these

13   for me.

14        Q.       You said there are some marks on your

15   other leg?

16        A.       That's not from the incident.

17        Q.       Are those bruises, or what are those?

18        A.       Huh-uh, they are not bruises.

19        Q.       Are those just birthmarks?

20        A.       Uh-huh.

21        Q.       Yes?

22        A.       Yes, sir -- I'm sorry.

23                 MR. PARR:  Make sure you say yes

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 33

1     A.     Yes.

2     Q.     You go on to say that this is the

3  third time that this Waffle House has been hit

4  since I have been here.  Is that an accurate

5  statement?

6     A.     Yes.

7     Q.     Following sentence says:  The first

8  time was on the restaurant's corner, and we had to

9  replace the awning.  Do you recall that incident?

10    A.     Yes.

11    Q.     Tell me what happened on that

12 particular incident that you were referring to.

13    A.     A tall van -- it was a medical

14 transportation van -- was backing up into the

15 parking lot, and it clipped the corner of the

16 awning.

17    Q.     He clipped the corner of the awning?

18    A.     Bent it was all he did.

19    Q.     Do you recall approximately what year

20 that occurred?

21    A.     I cannot recall.

22    Q.     That is fine -- when you said he

23 clipped the corner of the awning, looking at the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 34

1    photograph on Plaintiff's Exhibit 2, I believe you

2    kind of pointed to the left end of the building; is

3    that correct?

4         A.      That is correct.

5                     MR. CLEMMER:   Facing the

6    building?

7         Q.      (Mr. Parr)  If you are facing the

8    front of the Waffle House, it would be the left

9    corner going towards Fox Run Parkway over there,

10   right?

11        A.      Yes.

12        Q.      You said he was backing into the

13   parking lot; is that right?

14        A.      Yes.

15        Q.      What sort of damage was done to the

16   awning of the building?

17        A.      Simply bent the frame and ripped the

18   awning of the awning.

19        Q.      You said you had to replace it.   It

20   was damaged to the sufficient extent that the whole

21   awning had to be replaced on that occasion?

22        A.      No -- can I expound on that?

23        Q.      Absolutely.

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 35

1       A.      We couldn't match the colors, so we

2    had to replace the entire awning.

3       Q.      I understand -- so that first

4    incident was what you would characterize is fairly

5    minor damage?

6       A.      Yes.

7       Q.      Beyond that, you said:  The second

8    time it was right here, the same place.  What do

9    you recall about that second incident?

10      A.      All right, I will tell you exactly

11   what happened.  The customer was parked in this

12   same -- parked right here in the next parking spot

13   over.

14      Q.      In the parking spot to the right of

15   where the Lincoln Town Car was attempting to park?

16      A.      Yes -- customer was coming to get a

17   to-go order and left her vehicle in gear.  She got

18   out of her car, came into the Waffle House, came to

19   the high counter where that little -- that little

20   Danish display case is standing.

21      Q.      Correct.

22      A.      By that time, her car went over and

23   hit this little post right here, this little beam.

Plaintiff's Exhibit C

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 36

1      Q.      The beam, that's the --

2      A.      It's the panel beam.

3      Q.      The panel beam that is in the

4  photograph to the right of the Town Car?

5      A.      Yes.

6      Q.      So just on its own, because she left

7  it in gear, hopped over the curb and hit the

8  building?

9      A.      Yes.

10      Q.      What sort of damage was done to the

11  building?

12      A.      Very minor -- we just had to replace

13  the brown panel.  No glass was broken, nothing like

14  that at all.

15      Q.      When did that happen?

16      A.      I cannot recall.

17      Q.      Do you recall what sort of vehicle it

18  was that she left running and hit the building?

19      A.      I don't remember.

20      Q.      Were you in the restaurant at the

21  time of that second incident?

22      A.      I'm trying to think if I remember I

23  was.  It was at nighttime -- I don't remember if I

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 37

1    was or not.

2         Q.     Whether from your own recollection or

3    from what you were told, do you have any knowledge

4    of how many customers were in the restaurant at

5    that time -- and if you don't recall, then --

6         A.     I cannot recall.

7         Q.     What did you say that had to be

8    replaced after this second incident?

9         A.     The brown panel only.

10        Q.     The brown panel?

11        A.     Yes.

12        Q.     Just one of them?

13        A.     I think it was two -- they were bent.

14        Q.     No one was injured in that incident

15   then?

16        A.     Nobody was injured.

17        Q.     To your knowledge, other than the two

18   incidents you just spoke about and the one that's

19   reported in this newspaper, have there been any

20   other indents where a vehicle has struck this

21   particular Waffle House?

22        A.     No.

23        Q.     Let me ask you -- what, if anything,

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 38

1   was done to prevent vehicles from hitting the

2   Waffle House after that second incident?

3                 MR. CLEMMER:  Object to the

4   form.  You can answer if you know anything.

5        A.     I don't know.

6        Q.     (Mr. Parr)  As the division manager

7   for that division responsible for that particular

8   Waffle House, did you do anything to prevent

9   vehicles from striking the Waffle House?

10                MR. CLEMMER:  Object to the form.

11       A.     No.

12       Q.     (Mr. Parr)  Did you make any

13   suggestions to your bosses that anything be done to

14   prevent vehicles from striking the Waffle House?

15                MR. CLEMMER:  Same objection.

16       A.     No.

17       Q.     (Mr. Parr)  Were there ever any

18   discussions that you have knowledge of within the

19   company about making any sort of changes to prevent

20   vehicles from striking the Waffle House?

21                MR. CLEMMER:  Object to the form.

22       A.     No.

23       Q.     (Mr. Parr)  As the division manager

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 39

1    of the Waffle House, did you have any concern about

2    vehicles striking your store?

3         A.      Yes.

4         Q.      Did you have any concern after that

5    second incident that one of your customers might

6    possibly be injured by a vehicle striking the

7    store?

8         A.      Can you repeat that?

9         Q.      After that second incident where the

10   car actually hit the building, did it ever cross

11   your mind that some of the customers might be

12   injured if something similar happened?

13                     MR. CLEMMER:  Object to the

14   form.  You can answer.

15        A.      I really don't understand the

16   question.

17        Q.      (Mr. Parr)  Okay -- I'm not sure

18   where we are getting off.  You are the division

19   manager of that Waffle House; is that right?

20        A.      Yes.

21        Q.      As the division manager of the Waffle

22   House, in general terms, do you feel that you

23   should ensure that your customers are safe while

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 40

1    they are eating in your store?

2                      MR. CLEMMER:  Object to the form.

3       A.      Yes.

4       Q.      (Mr. Parr)  Would you agree that a

5    car driving through your restaurant has the

6    potential to cause injury to your customers?

7       A.      Yes.

8       Q.      What I'm asking -- and I'm not trying

9    to trick you here -- what I'm asking is:  That

10   second incident we talked about, a car which was

11   not occupied, jumped the curb and hit your

12   building?

13                      MR. CLEMMER:  Object to the form.

14      Q.      (Mr. Parr)  Is that right?

15      A.      Say that again.

16      Q.      The second incident that we just

17   spoke of, an unoccupied vehicle came over the curb

18   and hit the building?

19      A.      Yes.

20      Q.      What I'm asking you is:  After that,

21   did you have any thoughts that a similar incident

22   could possibly cause injury to your customers?

23                      MR. CLEMMER:  Object to the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 41

1    form.  You can answer.

2        A.      No.

3        Q.      (Mr. Parr)  Did you ever think that

4    it might be appropriate for there to be some sort

5    of barrier between the parking lot and the

6    building?

7                MR. CLEMMER:  Is there a

8    particular timeframe on that, or at any time?

9                MR. PARR:  I'm just wondering if

10   he ever thought it might be appropriate, but let's

11   say specifically after this second incident.

12       A.      Actually, I felt that that was a

13   barrier already, the parking bump.

14       Q.      (Mr. Parr)  Have you ever seen at

15   some of the other Waffle Houses whether there are

16   concrete or steel posts or horseshoes between the

17   parking lot and the store?

18               MR. CLEMMER:  I'm going to have

19   to object to the form.

20       A.      I've seen some.

21       Q.      (Mr. Parr)  Did you ever have the

22   thought that maybe those might be appropriate at

23   this particular store?

Plaintiff's Exhibit C

Page 42

1          A.          No.

2                         MR. PARR:   Can I take about a

3     five-minute break?

4                         MR. CLEMMER:   Sure.

5                         10:37 a.m.

6                         (Short break.)

7                         10:42 a.m.

8          Q.     (Mr. Parr)  Mr. Carlson, just a few

9     more questions for you.  Before we took a break, we

10    were discussing whether you ever thought there

11    needed to be any barriers other than what's already

12    there at that Waffle House.  Let me ask you, were

13    there ever, to your knowledge, any meetings

14    discussing safety of the parking lot design at this

15    Waffle House?

16         A.     Not that I'm aware of.

17         Q.     Not after the so-called second

18    incident where the car actually struck the

19    building?

20         A.     Not that I am aware of.

21         Q.     What about after this current

22    incident on January 1st of 2006, were there any

23    meetings about the safety of the parking lot?

Page 43

1                    MR. CLEMMER:   Object to the

2      form.  You can answer.

3           A.     Not that I'm aware of.

4           Q.     (Mr. Parr)  So as the division

5      manager for Waffle House encompassing the Opelika

6      restaurant, you never took any affirmative action

7      regarding barriers in that parking lot?

8                    MR. CLEMMER:   Object to the

9      form.  You can answer.

10          A.     No.

11          Q.     (Mr. Parr)  Have there been any

12     changes at all to the parking lot of the Waffle

13     House on Fox Run Parkway since January 1st of 2006?

14                   MR. CLEMMER:   Object to the

15     form.  You can answer.

16          A.     Not that I'm aware of.

17          Q.     (Mr. Parr)  So it is in substantially

18     the same condition as it was -- when I say "it",

19     meaning the parking lot -- on January 1st of 2006?

20          A.     Other than we painted the stripes.

21          Q.     Other than painting the stripes, it's

22     in substantially the same condition?

23          A.     Yes.

**Plaintiff's Exhibit C**

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 44

1          Q.      As a division manager, does safety in

2     general fall under your purview for the

3     restaurants?

4                      MR. CLEMMER:  Object to the

5     form.  You can answer.

6          A.      Yes.

7          Q.      (Mr. Parr)  It does?

8          A.      Yes.

9          Q.      So are there safety guidelines and

10    regulations that you follow for your store --

11    company policies, et cetera?

12         A.      We have company policies, and they

13    are contained in a book.

14         Q.      Related to safety issues?

15         A.      Yes.

16         Q.      Do you receive any company training

17    on safety issues in addition to the book that you

18    are given?

19         A.      Yes.

20         Q.      What sort of training?

21         A.      Just very minor -- cutting fingers,

22    and things like that, slips and falls -- nothing

23    pertaining to vehicles driving through the

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 45

1    restaurant.

2         Q.      Nothing, even after either of these

3    incidents about that?

4                   MR. CLEMMER:  Object to the form.

5         A.     No.

6         Q.     (Mr. Parr)  Again, just to make sure

7    we understood each other previously, you have

8    testified that after that second incident that

9    we've referred to where the car hit the building,

10   it never occurred to you or to your knowledge or

11   anyone else within the company that there should be

12   some sort of barrier?

13                  MR. CLEMMER:  Object to the

14   form.  He's asked and answered -- to the extent it

15   calls upon him to testify to impressions of a third

16   party, otherwise you can answer.

17        Q.     (Mr. Parr)  Forgot the question,

18   didn't you -- I'm just trying to make sure that we

19   understood each other before.  After that second

20   incident where the car struck the building, you

21   never had the thought that there should be some

22   sort of barrier between the parking lot and the

23   building, other than what was already there?

Plaintiff's Exhibit C

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 46

1                        MR. CLEMMER:  Same objection.  Go

2    ahead and answer.

3          A.    Yes -- whatever I answered before was

4    my answer is.

5          Q.    (Mr. Parr)  I just want to make sure.

6                        MR. PARR:  I don't have anything

7    else.

8                        MR. CLEMMER:  Thank you, sir.

9                     10:47 a.m.

10                * * * * * * * * * * * * * * * * * * * * *

11                FURTHER DEPONENT SAITH NOT

12

13

14

15

16

17

18

19

20

21

22

23

Plaintiff's Exhibit C

960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

AMBERLY JOHNSON,              )
                             )
        Plaintiff,           )
                             )
v.                           )     CV 3:06CV559-CSC-E
                             )
WAFFLE HOUSE, INC.,          )
                             )
        Defendant.           )

### WAFFLE HOUSE, INC.'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S NOTICE OF TAKING DEPOSITION DUCES TECUM OF WAFFLE HOUSE, INC.

**COMES NOW** Waffle House, Inc. ("Waffle House"), by and through their undersigned counsel, and serves its response and objections to the Deposition Notice of Waffle House, Inc., including the Request for Production of Documents, therein served by Plaintiff Amberly Johnson ("Plaintiff") as follows:

### GENERAL OBJECTIONS

1.      Waffle House objects to the discovery requests to the extent that they, individually or cumulatively, purport to impose on Waffle House duties and obligations beyond those permitted by the Federal Rules of Civil Procedure.

2.      Waffle House reserves all objections as to the competency, relevancy, materiality and admissibility of all of its documents or information of the subject matter thereof, all objections as to burden, vagueness, over breath and ambiguity, and all rights to object on any ground to the use of any document or information, or the subject matter thereof, in any subsequent proceeding, including without limitation the trial of this or any other action.

3.      Waffle House objects to the requests on the grounds that same are overbroad, vague, ambiguous, unduly burdensome or fail to specify the information or documents sought

**Plaintiff's Exhibit D**

with reasonable particularity, and to the extent that they seek information or documents that are not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence or are otherwise outside the scope of discovery permitted by the Federal Rules of Civil Procedure.

4.    Waffle House objects to the requests to the extent that they purport to require Waffle House to produce documents or provide information outside its possession, custody or control.

5.    Waffle House objects to the requests to the extent that they are repetitive and/or substantially overlap with other requests or require Waffle House to provide the same information or document more than once, on the ground that such duplicative disclosure is unduly burdensome.

6.    Waffle House objects to the requests to the extent that they seek documents or information that constitute or disclose confidential, personal or business information.  Waffle House objects to the requests to the extent that they require Waffle House to violate any applicable contractual obligations and duties to third parties.

7.    Waffle House objects to the requests to the extent that they require Waffle House to produce information or documents that were prepared for or in anticipation of litigation, constitutes attorney work product, are protected by the attorney-client privilege, constitutes or discloses the mental impressions, conclusions, opinions, or legal theories of any attorney or other representative of defendants concerning those or any other litigation, or is protected by any other applicable privilege, statute, rule or immunity.  Such information will not be produced, and any inadvertent production shall not be deemed a waiver of any privilege with respect to such information or of any work product doctrine which may apply.

8.    The specific responses of Waffle House to Plaintiff's requests made now or in the future are based upon information now available to Waffle House and Waffle House reserves the right at any time to revise, correct, add to, or clarify these objections or responses now made or made hereinafter to Plaintiff's requests.

9.    Any response or objection to any or all of the request do not mean necessarily that any information or documents exist or are in Waffle House's possession, custody or control that are responsive to any specific request.

10.    In each and every response, or sub-part thereof where Waffle House interposes an objection, such objection shall be construed to preserve all of Waffle House's rights to enter similar objections as to any future supplemental response to such request. Moreover, a failure to object herein shall not constitute a waiver of any objection that Waffle House may interpose as to any future supplemental answer or response.

11.    Waffle House's objections and responses to the requests are made expressly without in any way waiving or intending to waiver, but, rather, to the contrary, preserving and intending to preserve:

A.    All questions as to the competence, relevance, materiality, privilege, admissibility as evidence, or use for any purpose of the documents or information, or the subject matter thereof in any aspect of this or any other action, arbitration, proceeding, or investigation.

B.    The right to object on any ground to the use of any such document or information, or the subject matter thereof in any aspect of this or any other action, arbitration, proceeding, or investigation.

**Plaintiff's Exhibit D**                3

C.    The right to object at any time to a demand for any further response to this or any other request to produce.

D.    The right at any time to revise, supplement, correct or clarify these objections and responses.

## SPECIFIC OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION

**REQUEST:**

1.    Any records of this incident.

**RESPONSE:**

Waffle House objects to this request to the extent it seeks documents which are protected by the attorney/client privilege, the work product doctrine, or any other applicable privilege. Waffle House further objects to this request to the extent it seeks documents which are confidential or proprietary in nature. Without waiving these objections, Waffle House will produce non-privileged documents responsive to this request and will produce non-privileged documents which are confidential subject to a mutually agreeable confidentiality agreement and protective order.

**REQUEST:**

2.    Any records of previous, similar incidents at any Waffle House Restaurant.

**RESPONSE:**

Waffle House objects to this request because it is overly broad, unduly burdensome, is not reasonably limited in geographic or temporal scope, and seeks documents and information not reasonably calculated to lead to the discovery of admissible evidence. Further, Waffle House objects to this request because the term "Similar" is not defined and is therefore ambiguous. Additionally, Waffle House objects to this request to the extent it seeks documents which are protected by the attorney/client privilege the work product

doctrine, or which are confidential in nature. Without waiving these objections, Waffle House will produce any non-privileged documents relating to prior incidents of vehicles striking the Waffle House restaurant at issue in this lawsuit during the two years prior to the accident at issue and will produce non-privileged documents which are confidential subject to a mutually agreeable confidentiality agreement and protective order.

**REQUEST:**

3.    Any site plans, blueprints, etc., for this Waffle House Restaurant.

**RESPONSE:**

To the extent such documents exist and are in Waffle House's possession or control, Waffle House will produce documents responsive to this request.

**REQUEST:**

4.    Any corporate rules, suggestions, plans, etc. regarding design of new restaurants and their parking lots.

**RESPONSE:**

Waffle House objects to this request because it is overly broad, unduly burdensome, is not reasonably limited in geographic or temporal scope, and seeks information which is not reasonably calculated to lead to the discovery of admissible evidence. Waffle House further objects to this request because it seeks information which is confidential and proprietary in nature. Additionally, Waffle House objects to this request to the extent it seeks documents which are protected by the attorney/client privilege and the work product doctrine. Moreover, Waffle House objects to this request because the terms "...rules, suggestions, plans, etc." are not defined and are therefore ambiguous. Without waiving these objections, to the extent any such documents exist and are in Waffle House's possession or control, Waffle House will produce non-privileged documents applicable to

Plaintiff's Exhibit D                    5

the design of the restaurant in question and its parking lot during the two years prior to the accident at issue subject to a mutually agreeable confidentiality agreement and protective order.

**REQUEST:**

5.    Any company policies regarding installation of safety barriers between the restaurants and parking lots.

**RESPONSE:**

Waffle House objects to this request because it is overly broad, unduly burdensome, is not reasonably limited in temporal or geographic scope, seeks information which is not reasonably calculated to lead to the discovery of admissible evidence, and seeks information which is confidential and proprietary in nature. Additionally, Waffle House objects to this request to the extent it seeks documents which are protected by the attorney/client privilege the work product doctrine, or which are confidential in nature. Without waiving these objections, to the extent any such documents exist and are in Waffle House's possession or control, Waffle House will produce non-privileged documents responsive to this request applicable to the restaurant in question during the two years prior to the accident at issue subject to a mutually agreeable confidentiality agreement and protective order.

**REQUEST:**

6.    Corporate profit statements for the last three (3) years.

**RESPONSE:**

Waffle House objects to this request because it seeks information which is not reasonably calculated to lead to the discovery of admissible evidence at the trial of this case, seeks information which is confidential and proprietary in nature and is overly broad.

Plaintiff's Exhibit D                          6

<u>SPECIFIC OBJECTIONS AND RESPONSES TO AREAS OF TESTIMONY</u>

1.    Site design and safety.

RESPONSE:

Waffle House objects to this area because it is overly broad, unduly burdensome, is not reasonably limited in geographic or temporal scope, and seeks information which is not reasonably calculated to lead to the discovery of admissible evidence. Waffle House further objects to this area because it seeks information which is confidential and proprietary in nature. Additionally, Waffle House objects to this area to the extent it seeks information which are protected by the attorney/client privilege and the work product doctrine. Without waiving these objections, to the extent questioning is limited to non-privileged information related to the design of the restaurant in question and its parking lot as well as building safety from vehicle strikes related to the restaurant in question during the two years prior to the accident at issue and further that proprietary information provided is protected under a mutually agreeable confidentiality agreement and protective order, Waffle House will not object to said questioning.

2.    Previous and similar incidents at any Waffle House restaurant.

RESPONSE:

Waffle House objects to this area because it is overly broad, unduly burdensome, is not reasonably limited in geographic or temporal scope, and seeks information which is not reasonably calculated to lead to the discovery of admissible evidence. Waffle House further objects to this area to the extent it seeks information which is confidential and proprietary in nature. Additionally, Waffle

**Plaintiff's Exhibit D**

7

House objects to this area to the extent it seeks information which are protected by the attorney/client privilege and the work product doctrine. Without waiving these objections, to the extent questioning is limited to non-privileged information relating to prior incidents of vehicles striking the Waffle House restaurant at issue in this lawsuit during the two years prior to the accident at issue and proprietary information provided is protected under a mutually agreeable confidentiality agreement and protective order, Waffle House will not object to said questioning.

    3.    Corporate profits.

**RESPONSE:**

Waffle House objects to this area because it seeks information which is not reasonably calculated to lead to the discovery of admissible evidence at the trial of this case, seeks information which is confidential and proprietary in nature and is overly broad.

Respectfully submitted,

Robert E. Battle (ASB-7807-T67R)
Michael J. Clemmer (ASB-4005-E68M)
Attorney for Defendant Waffle House, Inc.

**OF COUNSEL:**

**BATTLE FLEENOR GREEN**
    **WINN & CLEMMER LLP**
The Financial Center
505 North 20th Street, Suite 1150
Birmingham, Alabama 35203
Telephone:    (205) 397-8160
Fax:    (205) 397-8179
Email:    rbattle@bfgwc.com

**Plaintiff's Exhibit D**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following counsel of record by directing same to their office addresses through first-class, United States mail, postage prepaid, on this the 11th day of September, 2007:

Benjamin H. Parr
INGRUM, RICE & PARR, LLC
410 Second Avenue
Opelika, AL 36801

OF COUNSEL

**Plaintiff's Exhibit D**

9

# ENGINEERING ANALYSIS REPORT
## WAFFLE HOUSE
## OPELIKA, ALABAMA

*Prepared for:*
Ingrum, Rice, & Parr, LLC
410 2nd Avenue
Opelika, AL 36801

*Prepared by:*
Barrett-Simpson, Inc.
223 South 9th Street
Opelika, AL 36801

2 October, 2007



# BARRETT-
# SIMPSON, INC.

223 South 9th Street, Opelika, AL 36801   (334) 745-7026 Tel   (334) 745-4376 (Fax)

Member
Investigative Engineers Association, Inc.

**Plaintiff's Exhibit E**

Mr. Ben Parr
Ingrum, Rice and Parr, LLC

RE: **INVESTIGATION OF WAFFLE HOUSE, INC., OPELIKA, AL**

Dear Counselor,

In accordance with your request, this organization performed an on-site inspection and engineering evaluation to determine if an inadequate design was performed in the parking lot of the Waffle House, Inc. located at 907 Fox Run Parkway in Opelika, AL. Our investigation was limited to onsite observations and interviews with you concerning the background of the case.

**BACKGROUND INFORMATION**

It is our understanding that a vehicle accelerated from the parking lot into the actual building of the Waffle House and injuries occurred to an individual due to Waffle House not having any physical barriers present that would prevent this situation from occurring. It is also our understanding that a situation of this kind had occurred previously at this same location.

**PURPOSE AND SCOPE**

The purpose of the investigation was to perform an onsite inspection and render an engineering opinion as to the possibility of the accident of the car driving through the building being avoided. The scope of our investigation included the following:

1. Site inspection
2. Site measurements, photos and record pertinent observations
3. Engineering assessment of site conditions and source of occurrence
4. Preparation of report to present results of findings and render a professional opinion.

**RESULTS OF INVESTIGATION**

We conducted our investigation on Thursday, September 27, 2007, in the presence Mr. Tom Carlson, Area Manager of Waffle House, Inc. and Mr. Ben Parr of Ingrum, Rice and Parr, LLC. In the course of our investigation, we made the following pertinent observations:

1. As a whole, the parking lot was designed and constructed within accepted engineering standards.
2. The concrete wheel stops that were placed in front of the glass building were of sufficient design and construction with every wheel stop fastened to the asphalt paving with accepted steel reinforcement rods.
3. The grade of the driveway coming into the parking lot from the main street and the grade of the parking lot were within accepted engineering standards.

**Plaintiff's Exhibit E**

4. Concrete bollards were found around the mechanical equipment at the rear of the building protecting the equipment from any vehicles. There were no bollards constructed between the building and the parking lot but there was in place a concrete wheel stop to prevent normal rolling and to slow down any forward progress of a rolling vehicle.

5. The height of the sidewalk between the asphalt paving and the building was 2-1/2". The width of sidewalk between the asphalt parking lot and the building was 5'-6". The distance from the curb stop to the sidewalk was 2'-3". Based upon these measurements, the closest a parked vehicle would be to a customer inside the building at any time would be 7'-9".

## DISCUSSION OF RESULTS

The parking lot was constructed and designed according to acceptable engineering standards. The standard care that Waffle House had in place to protect vehicles from rolling from a stopped condition was in place as the concrete wheel stop. There was no additional protection from a vehicle located 7'9" away to the area where the customers dined except for the glass panel of the building which provided no resistance to a vehicle with any speed coming from outside into the building.

## CONCLUSION

Based upon the results of our investigation, the following conclusion would appear to be warranted:

1. Waffle House had designed and constructed the parking based upon current engineering standards.

2. If the problem with an individual driving into the glass panel had occurred in the past, then additional protection such as the concrete bollards that were found in front of the mechanical equipment could have been placed between the parking area and the sidewalk to protect any vehicle from coming through the glass panels.

Conclusions drawn in this report are based upon observations and on information available, known and declared at the date of the investigation and/or time of the preparation of this report. Barrett-Simpson, Inc. reserves the right to amend and/or supplement this report in the event additional information, documentation or evidence becomes available.

This report is furnished as privileged and confidential to the addressee. Release to any other company, concern or individual is solely the responsibility of the addressee.

Sincerely,

Timothy W. Simpson
AL PE#17039

# Photographic Descriptions

**Plaintiff's Exhibit E**



Photo 5: Distance from Sidewalk to Curb Stop.



Photo 6: Height of curb stop.

**Plaintiff's Exhibit E**



Photo 3: Sidewalk width, from window.



Photo 4: Sidewalk height.

**Plaintiff's Exhibit E**



Photo 1: From entrance on Fox Run Parkway.



Photo 2: Subject Window

Plaintiff's Exhibit E



Photo 7: Bollards Around Mechanical Room



Photo 8: Bollards Around Mechanical Room

Plaintiff's Exhibit E

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 36

1    panicking and running around and a gas leak was

2    going on inside there, so everybody had to get out

3    of there at first.

4         Q.      Earlier there was a witness that said

5    that they saw the tires still turning when it came

6    into the restaurant. Do you recall one way or the

7    other whether that was the case?

8         A.      Not really, I couldn't tell. I know

9    the car made it to the back of the grill. As soon

10   as the car got to the back of the grill, it was

11   stopped. It hit the wall. Once he hit the wall,

12   it couldn't go no more. That was the only thing

13   that stopped it, the wall, or else it would have

14   went all the way through the whole restaurant.

15        Q.      Would you say that it came pretty

16   fast through the front of the restaurant, or how

17   would you describe it?

18        A.      They didn't hit the gas hard. It

19   would have went faster. It slowly came through

20   there. It just was a car, and it was a hard

21   impact. It just came on through, but there wasn't

22   too much gas being pushed because it was slow. I

23   had time to look back when I heard, and I seen the

Plaintiff's Exhibit F

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 37

1    car.  That's how I managed to grab Amberly and

2    trying to get her out the way, grabbing her leg and

3    yanking her in on the side.  It just scraped her

4    leg because I had grabbed her.  But it wasn't no

5    fast accident, it was kind of slow.  It just was

6    unusual.

7         Q.      So you said Amberly had scraped her

8    leg?

9         A.      Yes, sir.

10        Q.      Was she stuck in between the car and

11   the high bar at all, or did it just sort of brush

12   by her and scrape her leg?

13                MR. PARR:  Object to the form.

14        A.      Yes, it kind of grazed her leg.  It

15   tore her pants.  It tried to like yank -- if I

16   wouldn't have grabbed her, it probably would have

17   pulled her leg on in there.  If she would have sat

18   down, it would have yanked her on inside there with

19   the car.  Since I grabbed her, it only grabbed her

20   leg, a piece of glass got stuck inside her leg, and

21   stuff like that.  I really think I should get some

22   hero points, or something.  I should make the front

23   pape, or something.

**Plaintiff's Exhibit F**

e 960*Birmingham, AL 35203*www.merrillcorp.com
1-800-888-DEPO